UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

In re:                                                    Chapter 11

Menorah Congregation and Religious Center
d/b/a Camp Menorah,                                       Case No. 13-23976 (RDD)

                       Debtor.
_____x

Menorah Congregation and Religious Center
d/b/a Camp Menorah,

                       Plaintiff,

        v.                                            Adv. Pro. No. 15-08217 (RDD)

Ezra Feldman and Vladimir Loos,

                       Defendants.
_____x

Appearances:

Counsel:  Leo Fox, Esq., for the Debtor/Plaintiff

       David Maho, Esq., for Defendants

**MEMORANDUM OF DECISION AFTER TRIAL
ON OBJECTION TO DEFENDANTS' SECURED CLAIMS**

Hon. Robert D. Drain, United States Bankruptcy Judge

      In this adversary proceeding, the debtor/plaintiff, Menorah Congregation and Religious

Center (the "Debtor" or "Menorah") seeks an order (a) pursuant to Fed. R. Bankr. P. 3007(a)

and 7001(2), determining the extent of the judicial liens held by the defendants, Ezra Feldman

and Vladimir Loos (the "Creditors") on Menorah's real property located at 425 Old Falls Road,

Woodbridge, New York 12789 (the "Real Property") (specifically, Menorah contends that most

of the bungalows on the Real Property are personalty and, therefore, not subject to the

1

Creditors' judicial liens), and (b) pursuant to 11 U.S.C. § 506(a),[1] fixing the allowed amount of

the Creditors' secured claims in this case after taking into account the Real Property's value, the

allowed amount of claims secured by a senior lien on the Real Property, and costs chargeable

against Creditors' interests in the Real Property under 11 U.S.C. § 506(c).[2] See Pre-Trial Order

pursuant to Fed. R. Civ. P. 16, dated January 8, 2016, at ¶ I [Dkt. No. 21].

This memorandum of decision explains the basis for the Court's conclusion, after trial

and review of the parties' post-trial submissions, that the Creditors' judicial liens extend to the

bungalows, which are not personalty and, therefore, are part of the Real Property, and that the

aggregate amount of the Defendants' allowed secured claims in this case as of the date that

Menorah's chapter 11 plan was confirmed is $42,587.31, the remaining amount being

unsecured.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

157(a)-(b) and 1334(b) and the reservation of post-confirmation jurisdiction in Article XIV of

Menorah's Second Amended Plan of Reorganization, dated October 3, 2014 (the "Plan") [Dkt.

No. 72], and ¶ 7 of the Court's Order, dated January 22, 2015, confirming the Plan [Dkt. No. 96].

The parties' dispute concerns the allowance under 11 U.S.C. § 506 of the Defendants' secured

claims in this case, which are treated in ¶ 3.2 of the Plan to the extent that they are secured

and in ¶ 3.3 of the Plan to the extent that they are undersecured. The dispute thus arises under

---

[1] "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1).

[2] "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

the Bankruptcy Code and bears a close nexus to the Plan, which reserves this Court's power to

decide such issues, warranting the Court's exercise of post-confirmation subject matter

jurisdiction.  Cohen v. CDR Creances S.A.S. (In re Euro-American Lodging Corp.), 549 Fed. App'x

52, 54 (2d Cir. 2014); Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.), 448

Fed. App'x 134, 137 (2d Cir. 2011), cert. denied, 133 S. Ct. 51 (2012); SP Special Opportunities,

LLC v. LightSquared, Inc. (In re LightSquared, Inc.), 539 B.R. 232, 240-42 (S.D.N.Y. 2015).

Although consent is unnecessary given the fundamentally core nature of this claim

objection issue, the parties have expressly consented to the Court's final determination of the

dispute.  See Pre-Trial Order pursuant to Fed. R. Civ. P. 16, dated January 8, 2016, at ¶ II

(Menorah's consent); transcript of trial on February 8, 2016, at 5 (Creditors' consent).  Wellness

Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1944-45, 1948-49 (2015).

### Facts

The Court's findings of fact are based on the trial testimony, which comprised the expert

testimony of three real estate appraisers -- Menorah's expert, Brian Amiel; the Creditors'

expert, Robert Buckles; and Michael E. Holenstein, called by the Creditors, who provided

appraisals to a lender to Menorah, Presidential Bank -- and Menorah's manager/principal

Abraham Tabak,[3] as well as the exhibits admitted into evidence and the parties' stipulations.

Each of the witnesses was generally credible, although problems with certain aspects of their

testimony are noted below.

---

[3] References to trial testimony are designated as Tr. ___ if taken from live testimony at the trial held by the Court on
February 8, 2016; Decl. ¶ ___ if taken from a declaration submitted as direct testimony; and [Name] Rpt. if taken
from an appraiser's expert report.

The Creditors assert secured claims in this case in the aggregate amount of $573,139.73, and, if such claims are oversecured, accrued postpetition interest and other amounts to the extent allowed under 11 U.S.C. § 506(b).[4]  Their claims stem from judgments entered against Menorah by the Supreme Court, State of New York, Sullivan County, on August 23, 2013.[5]  It is not disputed that the judgments were recorded in Sullivan County, New York, creating judicial liens on the Real Property.  There is no evidence that the Creditors have a lien on any other property of the Debtor's estate, such as rents, other cash or personal property.

The parties have stipulated to the amount of the secured claim of Presidential Bank, which has a superior lien on the Real Property:  $1,785,325.69.[6]  In addition, Menorah has asserted, without objection by the Creditors, that it owes $12,087 of prepetition "landfill charges" to Sullivan County that are senior to the Creditors' judicial liens.[7]  Thus, the value of the Real Property must exceed $1,797,412.69, plus any amounts properly chargeable against the Creditors' collateral under 11 U.S.C. § 506(c), for the Creditors to have an allowed secured claim under 11 U.S.C. § 506(a).

Menorah is a bungalow colony in Sullivan County, New York that caters to the Jewish community.  It operates only during the summer season.  Located on 15.89 acres, the Real Property has 42 bungalows added between 1995 and 2010 (seven two bedroom units and 35 three bedroom units) and 23 one or two bedroom bungalows dating from the early 1940s.  It also has a schul, or synagogue, a meeting house, referred to as a "casino," some small buildings used for school classes, an in-ground swimming pool and a basketball court/playground, as well

---

[4] Trial Exhibit E:  Defendants' consolidated proof of claim, dated May 6, 2014.
[5] Id. These include a judgment in favor of Defendant Vladimir Loos as assignee of the estate of Marjorie Walker.  Id.
[6] Trial Exhibit D:  Amended Stipulation Regarding Presidential Bank's Loan Balance, dated February 4, 2016.
[7] Tabak Amended Decl. ¶9; Tr. at 138, 148-49

as some laundry, storage and utility sheds.  The buildings on the Real Property are wood frame

construction with asphalt shingle roofs and are not winterized.[8]

The 23 bungalows dating from the early 1940s are in poor condition and nearing the

end of their useful life[9] unless the Debtor invests substantial sums ($3,000 - $5,000 per unit) in

them, which it does not plan to do and apparently lacks the funds for even if it wanted to

update them.[10]  Moreover, by letter dated August 6, 2015, the Code Enforcement Officer for

the Village of Woodridge, New York informed Menorah that

> several buildings are condemned or will be condemned prior to next season. . . .
> A minimum of 2 buildings need to be removed prior to April 2016.  The
> agreement also needs to include a schedule for Mr. Tabak to adhere to, of
> demolition of the remainder of the old bungalows.  The unit numbers to be
> considered are Unit 1A, 1/2, 2A, 3/4, 3A, 5/6, 7, 8, 9, 10, 11, 11A, 12, 13, 13A, 14,
> 15, 38, 39, 40, 40A 46, 47, 48, 49, 50, 51, 52.  There is also a unit that is already
> condemned and has been for 2 years.  I do not know the unit number of this
> unit.
>
> The letter that you provide to my office will be a timeline that will be reviewed
> for approval and that will be strictly enforced in order for the community to be
> open next year.  Should the approved timeline not be followed then Menorah
> congregation will not be able to use the bungalow units listed above for the 2016
> season.[11]

---

[8] Amiel Rpt. at 35; Holenstein Rpt. at 2-3; Buckles Rpt. at 46.

[9] Tr. at Tr. 23-24, 53 (testimony of Mr. Amiel:  "very bad condition"), 132, 141 (testimony of Mr. Tabak:  "poor condition"); Holenstein Rpt. at 39 (describing older units as "'derelict' to 'fair' and . . . scheduled for demolition," and, therefore, concluding that "The current configuration of 42 functioning bungalow units represents the 'as is' condition of the subject property").  Mr. Buckles opined, to the contrary, that the older bungalows "are in fair to average condition," Buckles Rpt. at 46, and that "no functional or external obsolescence was observed at the time of the inspection," id. at 47, but this is clearly incorrect.   Indeed, at trial Mr. Buckles stated that at least some of the older units "are very bad," Tr. 211, and that the older units "probably could use everything" in the nature of repairs.  Id. at 213.

[10] Tr. at 141-42.

[11] Trial Exhibit G.  Based on this letter, it seems that more than the 23 older units are required to be demolished, although it is possible that the Code Enforcement Officer is referring to separately rented spaces within individual bungalows or, perhaps, to sheds in addition to the older bungalows.  No one at the trial suggested that any newer bungalows were going to be demolished.  See also Tr. at 146, where Mr. Tabak confirms the letter from the Code Enforcement Officer and states "23 or 25 units" are to be destroyed.

There is a January 8, 2016 letter[12] from the same Code Enforcement Officer stating that "An agreement was signed 8/20/15 with Menorah Congregation which included a schedule of demolition and replacement of several units over the course of the next seven years," although that agreement was not introduced into evidence.  Mr. Tabak testified that Menorah was planning to open for the 2016 season, which suggests that the conditions in the August 6, 2015 letter were met for 2016.  He also testified that Menorah rented 58 of its 65 units in 2015,[13] the vacant units presumably being among the older ones, and stated that "maybe you can squeeze another season out of some of them,"[14] again referring to the 23 older units.

A plan, the so-called "Youngblood Plan," was prepared in 2009 for the proposed replacement of the older bungalows slated to be destroyed, but, as noted above, Menorah lacks the wherewithal to implement it.[15]  Considering all of the foregoing, reliance on material income from more than the 42 newer units after 2016 is highly speculative.  As noted above, Mr. Holenstein opined in June, 2014 that one should not assume income from the older bungalows and, moreover, factored in a significant cost for their demolition.[16]  Without the admission of the August 20, 2015 agreement into evidence, it is, in fact, next to impossible to determine the amount of any income to be generated by the older units after 2016, because we do not know which are slated for demolition, and when, or are prohibited by the Village of Woodridge from being occupied.  This raises a significant problem with Mr. Buckles' May 22, 2014 valuation,

---

[12] Trial Exhibit 6.
[13] Tr. at 131.
[14] Tr. at 132.
[15] Tr. at 97-8, 168-69.  Mr. Holenstein chose not to rely on the Youngblood Plan.  Holenstein Rpt., cover letter, at 3.
[16] Holenstein Decl. ¶¶ 2, 7 ($115,000 demolition/cleanup cost).

which assumes seasonal income of $5,000 per unit for the 23 older bungalows,[17] as well

as describes those units as being in "fair to average condition"[18] and states that "no

functional or external obsolescence was observed at the time of inspection."[19] It also

raises an issue with Mr. Holenstein's revised June 2014 valuation relied on by the

Creditors because, as discussed below, it used aggregate income projections provided to

him by Presidential Bank which, notwithstanding Mr. Holenstein's view that one should

assume no income from the 23 older units, apparently included substantial income from

them.

Based on Menorah's monthly operating reports,[20] required to be filed under

penalty of perjury and prepared by Menorah's outside accountants,[21] Menorah had

gross income of $365,305.24 and net income of $59,841.70 in 2014, and gross income of

$405,076.30 and net income of negative $24,120.24 in 2015.[22] The operating reports

include debt service, as well as bankruptcy professional fees and U.S. Trustee's fees that

would not be recurring post-bankruptcy. Those amounts aggregate $138,358.85 for

2014 and $215,102.94 for 2015. Without those payments, Menorah's net income for

2014 would have been $198,200.28 and for 2015 it would have been $190,982.70,

according to the monthly operating reports.

---

[17] Buckles Rpt. at 147.

[18] Id. at 46.

[19] Id. at 47. As noted above, however, at trial Mr. Buckles stated that the older units "could probably use everything" in the nature of repairs because of their poor condition. Tr. at 213.

[20] Monthly Op. Rpts., Dkt. Nos. 25, 26, 27, 28, 29, 47, 56, 64, 76, 77, 87, 88, 91, 92, 93, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, and 126.

[21] Tr. at 152-53 (testimony of Mr. Tabak).

[22] Monthly Op. Rpts., supra note 20. Menorah did not file monthly operating reports for December 2014 and November and December 2015, but, given the nature of its business, it would not have had meaningful income or expenses in those months.

Mr. Tabak also submitted a January 14, 2015 declaration in support of confirmation of the Plan which stated that Menorah's gross income for 2014 was $391,328.49 with $58,871.51 of "additional receivables to be collected," and that Menorah had net income of $110,028.88.[23]  Finally, at trial, Mr. Tabak testified that Menorah's gross income was $450,000 for 2013, $408,000 for 2014, and $402,000 for 2015, within a few thousand dollars.[24]  (These figures, of course, included income from the 23 older units, and, as discussed above, there is no reliable evidence that such income will continue after 2016.)

Menorah also agreed, however, to a budget in this case with Presidential Bank for May through August 2014 (as discussed above, the only months when Menorah derives any meaningful income) showing projected gross income of $500,000 and projected net income of $52,301 (after projecting $159,644 of debt service, $30,000 of professional fees and $4,000 of U.S. Trustee fees),[25] a materially higher amount than set forth in the monthly operating reports, Mr. Tabak's testimony, or his January 14, 2015 declaration in support of Plan confirmation.

The Creditors, who asserted that Menorah's gross income was higher than testified to by Mr. Tabak or as set forth in the operating reports, attempted to impeach his testimony not only with this agreed budget but also with various pre-bankruptcy profit and loss statements for Menorah labeled "for Management Use Only."[26]  Mr. Holenstein testified that two of these

---

[23] Trial Exhibit 4.
[24] Tr. at 151-52.
[25] Trial Exhibit 5. See also Tr. at 154-55, where Mr. Tabak testified that this projection was prepared with the help of the Debtor's outside accountants.
[26]  Trial Exhibits 1-3.

were given to him by his contact at Presidential Bank,[27] and counsel for the Creditors

represented that the other statement was produced by Valley National Bank in discovery.[28]

They were admitted only for impeachment purposes because they could not be authenticated

and were not subject to a hearsay exception.[29]  They show gross income of $496,113 and net

income of $248,989.64 for 2008,[30] gross income of $558,113 and net income of $370,866.83 for

2009,[31] gross income of 681,279.22 and net income of $377,718.82 for 2011,[32] and gross

income of $667,653.64 and net income of $426,156.69 for 2012.[33]  Mr. Tabak stated that these

statements were neither prepared by Menorah nor accurate,[34] and it appears that they indeed

were not prepared by Menorah (which, given Mr. Tabak's chief cook and bottle washer role,

would not have added the footer "for Management Use Only"), and that their gross and net

income figures do not jibe with the evidence on Menorah's rental rates and fees or its annual

expenses, discussed below.   This raises a serious problem with Mr. Holenstein's revised June

2014 $3.6 million appraisal, because he relied when preparing it -- without due diligence -- on

the gross income figures provided him by Presidential Bank,[35] notwithstanding, moreover, that

a $1,642,000 appraisal of Menorah that Mr. Holenstein prepared just a month earlier for

Presidential Bank was "based upon [a] market survey" of income and expenses.[36]  Further, it

appears clear that the income figures from Presidential Bank that Mr. Holenstein used in his

---

[27] Tr. at 88-9.
[28] Tr. at 122, 127.
[29] Tr. at 129-130.
[30] Trial Exhibit 1.
[31] Id.
[32] Trial Exhibit 2.
[33] Trial Exhibit 3.  Tr. at 155, 158.
[34] Tr. at 123-24, 162.
[35] Holenstein Rpt. at 56; Tr. at 67, 70, 71, 90-91, 101 (testimony of Mr. Holenstein).
[36] Holenstein Rpt. at 56.  The market survey -- which shows rental rates in line with (indeed, somewhat less than) those applied by Messrs. Amiel and Buckles -- appears at page 42 of the Holenstein Rpt.

revised, June 2014 appraisal necessarily included substantial income from the 23 older

bungalows that he continued to opine should not be counted.

Mr. Tabak testified that Menorah rented the newer, three bedroom bungalows for

$7,000 to 7,500 a season.[37] He said nothing about the other units.  Mr. Buckles testified,

however, without objection or impeachment, that Mr. Tabak told him that Menorah rented the

(35) newer three bedroom bungalows for $8,500 a season, the (seven) newer two bedroom

bungalows for $7,500 a season, and the older bungalows for $4,500 to $5,000 a season.[38]  He

also testified, without objection or impeachment, that Mr. Tabak told him Menorah also

charges a "day-camp fee" to all renters, regardless whether they have children, of $800 per

season for the 42 newer units and $600 per season for the older units.[39]  Mr. Amiel used the

same amounts in his appraisal report submitted on the Debtor's behalf, with the exception of

assuming only $4,000 for the older bungalows.[40]  Using (a) Mr. Buckles' and Mr. Amiel's agreed

rental rates and fees and a $4,500 rate for the older bungalows, as well as (b) giving credence

to Mr. Tabak's testimony that 58 of the 65 units were rented in 2015, including, presumably, all

of the newer units, would lead to a calculation of $465,200 gross annual income for Menorah in

2015 (comprising $426,000 of rentals and $43,200 of mandatory "day-camp fees"), before

payment delinquencies.

Mr. Holenstein assumed a 5 percent delinquency/vacancy rate for the 42 older units,

and assumed a 15 percent delinquency/vacancy rate for all 65 units,[41] although he also opined,

---

[37] Tr. at 133.
[38] Tr. at 186-87.
[39] Tr. at 187.
[40] Amiel Rpt. at 74; see also Tr. at 19-20 (testimony of Mr. Amiel).
[41] Holenstein Rpt. at 14; Holenstein Decl. ¶ 6.

as noted above, that one should not assume any future income from the 23 older units.[42]  Mr.

Buckles assumed a 5 percent delinquency rate, including for the 23 older units.[43]  Mr. Amiel

assumed a 7 percent delinquency/vacancy rate, including for the 23 older units.[44]  If one does

not project meaningful income from the older units after 2016, a 5 percent delinquency rate on

the remaining 42 units is reasonable.  One could reasonably assume from the foregoing analysis

of Menorah's rentals, fees and delinquency rates, therefore, that Menorah's gross annual 2015

income could be approximately $441,940, which also would be a reasonably reliable prediction

for 2016, albeit that this is approximately $40,000 more than testified to by Mr. Tabak or set

forth in the monthly operating reports.  Deducting all 23 older units (and their related "program

fees") and using the same analysis based on rental rates, fees and delinquency rates also would

result in a projection for 2017 and thereafter of $364,420 gross annual income.

Both Mr. Holenstein and Mr. Buckles testified, moreover, that Menorah's rental rates

reasonably could be higher.  Mr. Holenstein stated that he believed that the newer two

bedroom and three bedroom units could be rented for $8,400 and $9,500 per season,

respectively, and that Menorah had the potential to charge another $150,000 in "miscellaneous

rentals" and $170,000 in program fees.[45]  These conclusions are not supported by convincing

examples of market-based rental rates or fees, however; the Court was essentially asked to

take Mr. Holenstein's word for it.  Indeed, it is clear that Mr. Holenstein backed into these

amounts having decided to accept -- without outside corroboration -- the Presidential Bank

profit and loss statements' representations, discussed above, of Menorah's 2008-2012 gross

---

[42] Holenstein Rpt. at 3, 23; Holenstein Decl. ¶ 2.
[43] Buckles Rpt. at 48.
[44] Amiel Rpt. at 74; Tr. at 50.
[45] Holenstein Decl. ¶ 5; Holenstein Rpt. at 44; Tr. at 100.  At trial, Mr. Holenstein reduced his $170,000 projection to $112,000.  Tr. at 100-101.

income. [46]  Notwithstanding Mr. Holenstein's undoubted experience, his credibility on this point was further undercut by the fact that he had prepared a $1,642,000 appraisal of Menorah only a month before his June 2014 $3.6 million appraisal, based on a market survey of rates and fees that were somewhat lower than those used by Messrs. Amiel and Buckles in their reports.[47]

Mr. Buckles' testimony regarding rental rates and fees that Menorah could charge -- $3,000 to $12,000 per season, with perhaps $10,000 to $12,000 for the newer units[48] -- also was largely unsupported by evidence of actual market rates, and in his report he chose to use the same rates and fees as Mr. Amiel with the exception of a slightly higher amount for the older bungalows.[49]

In sum, the evidence regarding Menorah's gross income is somewhat unreliable, although not because any credence should be placed in the pre-bankruptcy profit and loss statements relied on by Mr. Holenstein.[50]  Normally, the Court would place confidence with respect to the Debtor's gross and net annual income in the accuracy of Menorah's monthly operating reports.  However, the operating reports are somewhat suspect in light of Mr. Amiel's testimony and report on rental rates and fees and Mr. Buckles' testimony about what Mr. Tabak told him about rental rates and fees.  Weighing all of the evidence, the Court finds

---

[46] Holenstein Rpt. at 56.  Mr. Holenstein was quite candid that he relied solely on the information provided by Presidential Bank to revise his May 2014 appraisal, Tr. at 67, 71, 90-91, 101, and that he conducted no due diligence on it.  Tr. at 70.

[47] See Holenstein Rpt. at 42, showing market rental rate study relied upon for earlier report.

[48] Buckles Decl. ¶ 5.

[49] Buckles Rpt. at 147.  Mr. Buckles also acknowledged that the implied rental rates and fees underlying Mr. Holenstein's $3.6 million appraisal were much higher than the amounts Mr. Buckles used in his own appraisal.  Tr. at 216.

[50] As noted, the pre-bankruptcy profit and loss statements were admitted only for impeachment purposes and, in any event, show revenue that appears inflated and not supported by the testimony regarding Menorah's actual rental rates and fees.  One might speculate that they were prepared to justify extending credit, although who prepared them is unclear other than that it was not Menorah.  What is clear is that they were not useful to impeach Mr. Tabak.

that Menorah's projected gross income for 2016 would appear to be in the $405,000 to $440,000 range, including income derived from the 23 older units.  Thereafter, Menorah's annual gross income would best be projected at around $320,000 to 370,000.

There is less of a dispute over Menorah's annual expenses used to derive its net income. The only meaningful difference between Mr. Amiel and Mr. Holenstein on this point is that Mr. Amiel added a hypothetical annual expense of $50,000 for real estate taxes.[51]  However, as a not-for-profit entity, Menorah does not pay such taxes,[52] and, consistent with proper valuation principles under the Bankruptcy Code, discussed below, Menorah's projected expenses should not include a hypothetical amount for them.  Mr. Amiel also did not include the one-time costs described below for demolishing the older bungalows and repairing a water drainage problem.

Mr. Buckles projected expenses of $261,995, including $50,000 of real estate taxes.[53] After deleting these taxes, his projected expenses are $211,500, but he did not credibly explain why expenses such as repairs and maintenance should be lower than those assumed by the other two appraisers (even as he assumed, at $5,000 per season, the continued rental of the 23 older units which are in need of substantial repairs if they are not to be demolished).  Mr. Buckles also did not include the one-time drainage repair cost discussed below.  In light of all of the foregoing, projected reasonable expenses for Menorah for 2015 - 2016 are approximately $230,000 year (excluding the one-time costs discussed below and before debt service).

Assuming gross income of $422,500 for 2015 - 2016 (the midpoint in the range found above, which the Court finds is reasonable), this leads to an annual net income projection of

---

[51] Amiel Rpt. at 74 (showing annual expenses of $281,425.56, with real estate taxes); Holenstein Rpt. at 45 (showing annual expenses of $230,192, without real estate taxes). Tr. at 29-30.
[52] Tr. at 139.
[53] Buckles Rpt. at 148.

$192,500 for 2015 - 2016, before debt service, bankruptcy costs and the one-time costs discussed below.  With a projected lower gross income after 2016, Menorah's expenses also would be projected to be somewhat lower, although it would have to incur the demolition and clean-up costs discussed below.   Assuming $195,000 of expenses after 2016 (including demolition and cleanup costs spread over several years) and gross income of $345,000 (the midpoint of the post-2016 gross income range found above, which the Court finds is reasonable), Menorah's projected post-2016 net income would be $150,000, before debt service.

Menorah is required by a New York State Court ruling to fix a water drainage problem.[54] The Court accepts Mr. Tabak's testimony that the one-time cost of such work is $57,489.[55]  It also seems clear -- given the Village of Woodbridge's requirement that Menorah cease operation unless it demolishes the structures identified in the Code Enforcement Officer's August 6, 2015 letter -- that Menorah will incur a demolition/cleanup cost for such work.  The Court accepts Mr. Holenstein's $115,000 estimate[56] for such cost.

Sixty of the 65 bungalows rest on piers or other temporary supports; five are attached to foundations.[57]  All of the bungalows are attached to plumbing and electrical wires,[58] although, according to Mr. Tabak, the bungalows on piers could be removed

---

[54] Tr. at 136-37, 161.
[55] Tabak Amended Decl. ¶ 7; Tr. at 138, 148-49.
[56] Holenstein Decl. ¶ 7.
[57] Tabak Amended Decl. ¶ 10.
[58] Tr. at 135 (testimony of Mr. Tabak).

easily with the use of a trailer.[59]  He also testified that some of the bungalows in fact

were moved to Menorah "probably 30 years ago."[60]

      The appraisals contain photographs of representative bungalows.[61]  The newer

ones pictured are quite large and would seem, contrary to Mr. Tabak's testimony

(which, of course, is not expert testimony), difficult to move, regardless that they are

not embedded in the land or any foundation.  The older bungalows pictured appear to

be quite ramshackle.  Although they seem small enough to move, transporting them

would seem, based on the photographs and the testimony about their dilapidated

condition, to put them at serious risk of collapse.

      There is no evidence of the cost of moving any of the bungalows, or whether

they would be worth moving -- that is, whether there is, or was, any legitimate business

reason to move them.  Because Menorah owns the bungalows and the land on which

they sit and Menorah has always derived its income from their seasonal rental, it can be

reasonably inferred that they were intended to remain in place until they are of no

further use -- a time, as discussed above, that is near for the 23 older units.

### Discussion

**A.**    **Are the bungalows real property, subject to the Creditors' judicial liens?**  The parties

agree that the Creditors' judicial liens do not extend to personal property.  Applicable non-

---

[59] Tr. at 134, 147.

[60] Tr. at 147.

[61] Trial Exhibits A1 [Amiel Report], A2 [Holenstein Report], and B2 [Buckles Report].

bankruptcy law governs whether the bungalows are personalty, here the law of New York,

where the bungalows are located.[62]  Under New York common law,

> For the purpose of determining whether chattels annexed to realty remain
> personalty or become realty, chattels are divided into three classes:  (1) some
> chattels, such as gas ranges, because of their character as movables,
> remain personalty even after their annexation, regardless of any agreement between
> the chattel owner and the landowner; (2) other chattels, such as brick, stone and
> plaster placed in the walls of a building, become realty after annexation,
> regardless of any agreement to the contrary between the chattel owner and the
> landowner; such personal property does not retain its character as such if it be
> annexed to the realty in such manner as to be become an integral part of the
> realty and be immovable without practically destroying the personal property, or
> if all or a part of it be essential to the support of the structure to which it is
> attached; and (3) still other chattels, after attachment, continue to be personalty
> or become realty in accordance with the agreement between the chattel owner
> and the landowner.

Sigrol Realty Corp. v. Valcich, 12 A.D.2d 430, 212 N.Y.S.2d 224, 227 (2d. Dep't 1961),

aff'd. 11 N.Y.2d 668 (1962) (citations omitted).  See also  Mastrangelo v. Manning, 17

A.D.3d 326; 793 N.Y.S.2d 94, 95-6 (2d Dep't 2005):

>  A fixture [i.e. realty] is personalty which is:  (1) actually annexed to real property
> or something appurtenant thereto, (2) applied to the use or purpose to which
> that part of the realty with which it is connected is appropriated, and (3)
> intended by the parties as a permanent accession to the freehold.  Less
> significance is accorded to the manner of annexation and more to the intention
> of the person annexing the property.  The permanency of the attachment does
> not depend so much upon the degree of physical force with which the thing is
> attached as upon the motive and intention of the party in attaching it.  The
> intent which is regarded as controlling is not the initial intention at the time [the]
> item is acquired, nor the secret or subjective intention of the party making the

---

[62] The burden of proof is governed in part by bankruptcy law.  Under Fed. R. Bankr. P. 3001(f), a proof of claim, like the Creditors' claims here, that complies with the Bankruptcy Rules is prima facie evidence of the validity and amount of the claim.  Menorah therefore has the initial burden to produce evidence to support its objection, although the Creditors have the ultimate burden of proof under applicable non-bankruptcy law.  Morse v. ResCap Borrower Claims Trust, 2015 U.S. Dist. LEXIS 9646, at *7 (S.D.N.Y. Jan. 26, 2015); Franklin v. Residential Capital, LLC (In re Residential Capital, LLC), 2014 U.S. Dist. LEXIS 60828, at *17-18 (S.D.N.Y. May 1, 2014); Lepage v. Bank of Am. (In re Lepage), 2011 Bankr. LEXIS 1842, at *11-12 (Bankr. E.D.N.Y. May 18, 2011) ("Once the Debtor's burden has been met, the [secured creditor] must submit sufficient evidence to overcome the Debtor's valuation.").

attachment, but rather the intention which the law will deduce from the circumstances.

(citations and quotation marks omitted).

N.Y. U.C.C. § 9-334 incorporates much of this common law[63] when addressing the

analogous issue of the priority of security interests in fixtures against the interests of an

encumbrancer or owner of the real property to which they are affixed.  See, e.g., Official

Comment 3 to N.Y. U.C.C. § 9-334:

> [T]his section recognizes three categories of goods:  (1) those that retain their
> chattel character entirely and are not part of the real property; (2) ordinary
> building materials that have become an integral part of the real property and
> cannot retain their chattel character for purposes of finance; and (3) an
> intermediate class, that has become real property for certain purposes, but as to
> which chattel financing may be preserved.

Although the parties' intentions as stated or evidenced to each other should control

between them if the property at issue does not fall into the first two categories, as described in

Valcich, 212 N.Y.S.2d at 227; see also In re Thompson, 217 B.R. 375, 376-77 (B.A.P 2d Cir. 1998),

objective criteria, such as the degree of the property's attachment to the realty and whether

removing it would be difficult or threaten to destroy it, the degree to which the property is

integral to the use of the realty, and the cost of removal compared to the value of the property

at issue control where there is no expression or evidence of the parties' mutual intent or third

parties' rights are involved.  In re Fink, 4. B.R. 741, 744 (Bankr. W.D.N.Y. 1980) (applying N.Y.

U.C.C. § 9-313, superseded by N.Y. U.C.C. § 9-334); Chabon v. Lazarus, 87 A.2d 435, 438 (N.J.

---

[63] The parties have cited various New York State tax laws that characterize bungalows as real or personal property for tax purposes.  These statutes, however, have no bearing on whether a structure affixed to land is personalty or real property for other purposes., Matter of Schneider v. Schuyler County, 2016 N.Y. App. Div. LEXIS 4338 (3d Dept. June 9, 2016) (whether bungalows are subject to tax does not depend on whether they are realty or personalty but, rather, language of tax statutes); 13-133 Warren's Weed New York Real Property § 133.04 (2015).  The parties have not pointed to any statute that would vary the common law authority cited above.

Super. App. Div. 1952) (New Jersey law); In re Chattanooga Choo-Choo Co., 98 B.R. 792, 801-02

(Bankr. E.D. Tenn. 1989) (applying Tennessee version of N.Y. U.C.C. § 9-313, superseded by N.Y.

U.C.C. 9-334).  Moreover, "[a]n owner of real property is much more likely to intend

permanency [for structures placed by him on his property] than one in possession of premises

temporarily, as for example a tenant.  As to fixtures, the same rule prevails between mortgagor

and mortgagee as between grantor and grantee.  The importance of the relationship to the

property of the person making the attachment is never to be minimized.  Indeed, in a doubtful

case it may well become decisive."  Marine Midland Trust Co. v. Ahern, 16 N.Y.S.2d 656, 660

(Sup. Ct., Broome Cty. 1939).  See also Van Buren v. Gallo, 157 Misc. 289, 283 N.Y.S. 453, 455-56

(Sup. Ct. Del. Cty. 1935) (dance hall that was readily removable and intended as personalty by

party to purchase agreement for land on which it was affixed nevertheless subject to pre-

existing mortgage on the land; mortgage holder was not aware of other party's intent).

Here, of course, there is no past expression of intent by Menorah that the bungalows be

treated as personalty, let alone one that the Creditors could be said to have been aware of or

concurred with.  From the evidence, the bungalows are either difficult to move or, if movable,

in such poor condition that moving them would very likely destroy them.  Moreover, the

bungalows at issue were placed on the Real Property by the land's owner, and the most readily

moved ones have been there for decades.  Until the approaching end of their useful life they

have been integral to Menorah's use of the Real Property, as a bungalow colony.  Menorah has

no legitimate reason to move them now.  Under such circumstances, it cannot be said that any

18

of the bungalows is personalty; rather, all of them should be treated as part of the Real

Property and thus subject to the Creditors' judicial liens.[64]

Based on this determination, the Court has not considered Mr. Amiel's second appraisal

report, Trial Exhibit G, which values the Real Property excluding all but five of the bungalows.

**B.    What is the value of the Creditors' collateral?**  Although the parties disagree about the

value of the Real Property, they agree on certain points in addition to the areas of consensus

discussed above.  First, they state that the Real Property's highest and best use is as a bungalow

colony -- that is, its current use.[65]  This conclusion dovetails with Associates Commercial Corp. v.

Rash, 520 U.S. 953 (1997), which holds that the value of collateral under 11 U.S.C. § 506(a)

should be determined "in light of the purpose of the valuation and of the proposed disposition

or use of such property."  Id. at 961-62.  Thus, where, as here, collateral is being valued in a

context where the debtor is proposing to keep it, the focus should be on the collateral's value

---

[64] To the extent that the bungalows are properly viewed as fixtures under N.Y. U.C.C. § 9-334, they would be subject to the general rule stated in that section:  "General rule:  subordination of security interest in fixtures.  In cases not governed by subsections (d) through (h), a security interest in fixtures is subordinate to the conflicting interests of an encumbrancer or owner of the related real property other than the debtor."  N.Y. U.C.C. § 9-334(c).  The only possible exception to this general rule is N.Y. U.C.C. § 9-334(e)(3), which states that "A perfected security interest in fixtures has priority over a conflicting interest of an encumbrancer or owner of the real property if the conflicting interest is a lien on real property obtained by legal or equitable proceedings after the security interest was perfected by any method permitted by this article."  Here, however, there was no perfected lien on the bungalows before the Creditors' judicial lien, including any hypothetical lien status that Menorah as a debtor in possession would have under 11 U.S.C. § 544, other than the two admittedly senior interests of Presidential Bank and Sullivan County.  Thus, the Creditors' judicial lien takes precedence on the Real Property, including the bungalows, subject only to the senior mortgage of Presidential Bank and Sullivan County's interest based on the Menorah's unpaid landfill charge.

[65] Amiel Rpt. at 23; Holenstein Rpt. at 14 and 39; Buckles Rpt. at 15.  "The American Institute of Real Estate Appraisers defines the term 'Highest and Best Use' as 'that reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.  Alternately, that use, from among reasonable, probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest land value.'"  In re YL West 87th Hldgs I LLC, 423 B.R. 421, 429 n.14 (Bankr. S.D.N.Y. 2010).

in the debtor's possession, namely, the replacement value to the debtor of property of the same type and condition.  Id. at 962-63.[66]

Second, the appraisers agree that Menorah's projected net income is sufficiently stable to use the "income capitalization" valuation methodology, which each appraiser has applied to the Real Property.[67] (It should be noted, though, that each appraiser treated the imminent change in income required by the need to demolish or repair the 23 older bungalows differently from the other appraisers.)

Last, although the dates of the appraisals somewhat differ -- Mr. Amiel's appraisal is as of January 15, 2015, Mr. Holenstein's is as of May 2014, as revised June 20, 2014, and Mr. Buckles' is as of May 22, 2014[68] -- no one contends that the value of the Real Property materially changed between appraisals.  As noted by Mr. Buckles, the market for bungalow colonies in Sullivan County has been flat since at least 2009.[69]

The appraisers do not agree, however, on the advisability of using the other two recognized methods to value real property -- the "comparable sales" approach and the "cost" approach.  Messrs. Amiel and Buckles eschewed the cost approach but employed a comparable

---

[66] The Rash Court clarified its holding by noting that by "replacement" value it meant value from the debtor's perspective; such value would not include, therefore, aspects of the retail value of a comparable asset attributable to features such as warranties and reconditioning that would not apply to the actual property proposed to be retained under the debtor's plan.  520 U.S. at 966 n.6.  Rhua the Court's use of the term "replacement value" should not be equated with the "cost" valuation methodology, which is based on the cost of using new materials to substitute for the property at issue. Congress amended section 506(a) of the Bankruptcy Code to alter Rash's holding with respect to individual debtors' personal property, see 11 U.S.C. § 506(a)(2), which does not, of course, apply to Menorah's Real Property.  The parties' agreement that the Real Property's highest and best use is consistent with the Debtor's proposed use of it in any event sidesteps any issue whether a "highest and best use" valuation premised on a use that is inconsistent with the debtor's proposed use should be applied.  See, e.g., In re Tapang, 2015 Bankr. LEXIS 1349, at *44 n.10 (Bankr. N.D. Cal. Apr. 17, 2015); In re Standley, 2012 Bankr. LEXIS 5674, at *31-32 (Bankr. D. Mont. Dec. 7, 2012).
[67] Amiel Rpt. at 72-75; Holenstein Rpt. at 41-49; Buckles Rpt. at 145-148.
[68] Amiel Rpt. at 12; Holenstein Rpt. at 4; Buckles Rpt. at 4.
[69] Tr. at 208, 209.

sales methodology in addition to the income capitalization approach.  Mr. Holenstein used a

comparable rental approach for his earlier, May 2014 $1,642,000 appraisal, but did not use it

for his revised, June 2014 $3.6 million appraisal.  In addition to employing an income

capitalization approach premised on the new, un-vetted income assumptions provided to him

by Presidential Bank, Mr. Holenstein used a cost approach in his revised appraisal, which led to

a value that matched his revised income capitalization conclusion.

i.      **Valuation methods for real property.**  It is well recognized, including by each of the

appraisers here, that valuations of real property are not mathematical exercises.  They involve

reasoned judgments about the market, comparable properties and the specific property at

issue.  In re Ricci-Breen, 2015 Bankr. LEXIS 2909, at *16 (Bankr. S.D.N.Y. Aug. 31, 2015); In re

Chait Props., 2013 Bankr. LEXIS 3746, at *9 (Bankr. E.D.N.Y. Sept. 10, 2013).  The Court is not

bound by the experts' appraisals and may form its own opinion of a property's value.  In re

Chait Props., 2013 Bankr. LEXIS 3746, at *10 (Bankr. E.D.N.Y. Sept. 10, 2013); Karakas v. Bank of

New York (In re Karakas), 2007 Bankr. LEXIS 1578, at *17 (Bankr. N.D.N.Y. May 3, 2007).  In the

exercise of its discretion, the Court should consider the experience,[70] accuracy and general

credibility of the expert witnesses, and the logic and persuasiveness of their analyses in light of

the facts.  In re Ricci-Breen, 2015 Bankr. LEXIS 2909, at *16; In re Chait Props., 2013 Bankr.

LEXIS 3746, at *10.

The three most widely recognized valuation methods for real property are (1) the

income capitalization approach, for income-producing property, (2) the comparable sales

---

[70] Here, each appraiser was quite experienced, including in valuing bungalow colonies in Sullivan County, New York.  Each was a New York State licensed general real estate appraiser. Mr. Holenstein was also an MAI licensed appraiser.  Each has many years of appraisal experience and has performed valuations of many bungalow colonies.

approach, when the property is in an active commercial market, and (3) the cost or land

development approach, minus depreciation, if the property is a rarely traded specialty.  United

States v. Certain Property in Manhattan, 403 F.2d 800, 802 (2d Cir. 1968); see also In re Chait

Props., 2013 Bankr. LEXIS 3746, at *10-11; In re Fortune Smooth (U.S.) Ltd., 1993 Bankr. LEXIS

2377, at *5-6 (Bankr. S.D.N.Y. July 8, 1993).

   "The income capitalization approach is generally regarded as the preferential method

for determining the value of income producing property."  41 Kew Gardens Rd. Assocs. v.

Tyburski, 70 N.Y.2d 325, 331 (1987); see also In re Chait Props., 2013 Bankr. LEXIS 3746, at *11;

In re Ridge Mt., LLC, 2012 Bankr. LEXIS 5882, at *19 (Bankr. N.D.N.Y. Dec. 21, 2012); In re

Fortune Smooth, 1993 Bankr. LEXIS 2377, at *6.  The method assumes that a willing buyer of

income-producing property wants "to realize a return on investment consisting of (1) full

recovery of the amount invested (i.e., the return of capital), and (2) a profit reward (i.e., a

return on capital).  The value of the property is the product of the property's expected net

income divided by a capitalization rate, which is defined as the annual rate of return necessary

to attract investment capital."  In re Fortune Smooth, 1993 Bankr. LEXIS 2377, at * 6; see also In

re YL West 87th Hldgs. I LLC, 423 B.R. 421, 429 n.15 (Bankr. S.D.N.Y. 2010) ("In utilizing this

method, an appraiser considers annual existing income and market expenses to determine

annual net operating income.  The net operating income level is further processed by using an

appropriate capitalization or yield analysis technique to produce an indication of final value.");

In re SM 104 Ltd., 160 B.R. 202, 211 (Bankr. S.D. Fla. 1993) ("[T]he income capitalization

approach is a two-step analysis.  First, the future net operating income of the property is

estimated.  Next, that income is divided by a capitalization rate ('capitalized') to obtain the fair
market value.").

The expenses to be deducted from gross income to arrive at net income are operating
expenses, including taxes.  In re Fortune Smooth, 1993 Bankr. LEXIS 2377, at *6-7.  Debt service
is not deducted, because finance costs are factored into the capitalization rate.  Tr. at 228-29
(testimony of Mr. Buckles).  See In re Tippp Hill Assocs., 1996 Bankr. LEXIS 1741, at *10 n.4 (Bankr.
N.Y.D.Y. July 31, 1996) ("This method takes into account the rate of interest an investor would
have to pay on a mortgage on the Premises and also receive a fair return on his/her equity
investment.").

It is generally accepted that (a) the property's actual income and expenses should be
used, absent distortions from the rental market, id., at *16; In re Fortune Smooth, 1993 Bankr.
LEXIS 2377, at *10; provided, as noted above, (b) the components of the property's net income
are stable, or readily stabilized.  In re Ridge Mt., LLC, 2012 Bankr. LEXIS 5882, at *20-21.[71]

As with all valuation methodologies, the income capitalization approach is only as
reliable as the underlying data upon which the calculation is based.  If the gross income or
expenses employed are materially incorrect, it is "garbage in and garbage out."  Compare In re
Chait Props., 2013 Bankr. LEXIS 3746, at *12 (noting appraisers' failure to verify expenses and
vacancy rates materially affected credibility of income capitalization analyses); In re Fortune
Smooth, 1993 Bankr. LEXIS 2377, at *10-11 ("[W]e find that [the appraiser's] complete
disregard for the debtor's actual operating experience severely undermines the validity of his

---

[71] A second, "market stabilization rate" may be employed under appropriate circumstances when stabilization has
not yet occurred but is reasonably predictable for the property at issue based on market data.  In re Tree Pine Mall
Assocs. Ltd. P'ship, 2010 Bankr. LEXIS 564, at *8-9 (Bankr. S.D.N.Y. Mar. 10, 2010), or the appraisers or the court
may make other adjustments if the cost to getting to a stabilized income is relatively fixed and predictable.  In re
Ridge Mt., LLC, 2012 Bankr. LEXIS 5882, at *22.

analysis.") and In re Old Colony, LLC, 476 B.R. 1, 16 (Bankr. D. Mass. 2012) (noting that both appraisers relied "on historical financial information provided by the Debtor and verified as reasonable through comparison to objective market data"); In re Tippp Hill Assocs., 1996 Bankr. LEXIS 1741, at *16 (appraisers used accurate actual income and expenses; no evidence of factors indicating that such amounts were out-of-market).

Similarly, if the information underlying the proposed capitalization rate does not track the finance market for similar properties, it cannot be relied upon.  In re Chait Props., 2013 Bankr. LEXIS 3746, at *17-18; In re SM 104 Ltd., 160 B.R. at 212-13.

ii.     **Application of the income capitalization method to the Real Property.**  Here, as previously found, the gross income amount used by Mr. Holenstein in his revised, $3.6 million income capitalization analysis is untethered to the evidence and not credible.  This error unacceptably skewed his valuation upward.  Courts have at times averaged competing valuations, or elements of valuations, whose imperfections offset each other, but this is not such a case; Mr. Holenstein's unsupported income assumptions take his revised June 2014 valuation well beyond a reasonable range.[72]

As previously found, elements of Mr. Buckles' net income calculation also are materially flawed.  First, Mr. Buckles assumed steady income from Menorah's 23 older bungalows, which, however, clearly need to be either demolished or repaired for Menorah to continue to operate (leading Mr. Holenstein to completely exclude them from his income capitalization analysis).  In addition, Mr. Buckles' expense estimate was unreasonably low, ignoring any cost of

---

[72] In addition to the findings regarding Menorah's gross income set forth above, Mr. Buckles testified that he was aware of only one sale of a bungalow colony approaching $3.5 million, which occurred approximately 15 years earlier and involved a property with materially more bungalows that Menorah's. Tr. at 196-98.

demolishing the 23 older bungalows (whereas Mr. Holenstein added a $115,000 one-time demolition cost) and using too low a figure for maintenance and repair (especially in light of his assumption of continued income from the 23 older units).  A material downward adjustment of income or an upward adjustment in expenses to reflect the facts pertaining to these 23 units was required.  See In re Old Colony, LLC, 476 B.R. at 16-17 (criticizing appraiser for not including necessary capital expenditures in his calculation of expenses).  Mr. Buckles also did not include the one-time water drainage repair cost among projected expenses.

The inputs underlying Mr. Amiel's income capitalization analysis are wanting in certain respects, too.  Like Mr. Buckles, he should not have included a $50,000 real estate tax expense, nor did he adequately recognize the effect of the impending obsolescence of the 23 older bungalows on Menorah's gross income (he assumed steady income from them, albeit with a 7 percent instead of a 5 percent delinquency/vacancy rate) or its expenses (he did not assume any extraordinary demolition and cleanup costs or, it appears, mounting expenses, in the alternative, to rehabilitate the older units).  He also did not include the one-time water drainage repair cost.

This raises the question whether there is sufficient evidence for the Court to correct the problems with the Buckle and Amiel net income calculations.  As noted above, the evidence regarding Menorah's gross income in particular was somewhat problematic.  Nevertheless, as previously found, a reasonable net income for 2015 - 2016 and thereafter can be derived from the evidence.  The Court concludes that the cost of dealing with the 23 older bungalows and the water drainage issue can be factored into the Court's earlier calculations of net income for 2015 - 2016 and thereafter to derive a stabilized net income of $160,000.  This assumes that

the demolition/cleanup and drainage repair costs can be paid from accumulated cash, some ongoing rentals, at reduced rates, of the older units and some belt tightening.

The appraisers differ far less on capitalization rates. Mr. Amiel's is 8.94 percent, Mr. Holenstein's is 8.67 percent, and Mr. Buckles' is 8.91 percent.[73] Each appraiser's support for his capitalization rate also was similar, and there was no testimony regarding whether market rates changed in the six months between Mr. Holenstein's and Mr. Buckles' appraisals, on the one hand, and Mr. Amiel's, on the other. Therefore, the Court will average the three rates and assume a capitalization rate of 8.84. Applying that rate to stabilized net income of $160,000 derives a $1,809,955 value for Menorah under the income capitalization approach.

**iii.   Application of the cost and comparable sales methods to the Real Property.** Because of the problems underlying the net income assumptions in the appraisers' income capitalization analyses, it is worthwhile to consider an alternative valuation methodology as a reality check, assuming, of course, that such alternative is itself reasonably reliable. In re Chait Props., 2013 Bankr. LEXIS 3746, at *18 ("In such cases, the use of comparable data and specifically the sales comparison approach as a crosscheck is often expected."); In re YL West 87th Hldgs. I LLC, 423 B.R. at 429 (using both income capitalization and sales comparison approaches).

As noted, Messrs. Amiel and Buckles also valued the Real Property using a comparable sales approach. Mr. Holenstein testified that he believed, to the contrary, that there was not enough reliable data to perform a comparable sales analysis.[74] This is belied, however, by the several comparable sales and pending sales of bungalow colonies identified by Messrs. Amiel

---

[73] Amiel Rpt. at 74; Holenstein Rpt. at 48; Buckles Rpt. at 148.
[74] Tr. at 66.

and Buckles.  Instead, Mr. Holenstein chose to perform a cost analysis, which happened to

arrive at almost the same $3.6 million valuation as his revised income capitalization approach.[75]

Messrs. Amiel and Buckles properly decided not to use a cost methodology, which

"typically reflects the reproduction cost or the replacement cost of the subject property."  In re

Old Colony, LLC, 476 B.R. at 11.  As stated by Mr. Buckles, "The Cost Approach is generally most

applicable when the improvements are new and at their highest and best use, or for special use

purposes such as churches, schools, etc. when there are no comparable sales available."[76]  It is

not useful, given that (a) Menorah is viewed as "an "older colony"[77] and (b) even the 42

"newer" bungalows are several years old and, therefore, it is difficult to address physical

depreciation.[78]  Mr. Amiel gave a similar reason for not using the cost approach.[79]  Their

conclusions are supported by the case law, which seldom reflects actual use of the cost

approach if the property at issue produces income or there are at least some comparable sales

in the same area.  See, e.g., In re Old Colony, LLC, 476 B.R. at 12 ("Because the cost approach

rarely provides an accurate reading of the fair market value of the real estate, appraisals

routinely disregard it or mention it only in passing, and concentrate their efforts on the sales

comparison and income approaches and then adjust for any differences between the two."); In

re YL West 87th Hldgs. I LLC, 423 B.R. at 430 (noting that "(1) the Cost Approach is less effective

---

[75] Holenstein Rpt. at 49-54 (resulting in a $3.674 million valuation).  As noted, one month earlier Mr. Holenstein had delivered a $1,642,000 valuation to Presidential Bank, which was based on the income capitalization approach and a comparable rental analysis that he revised in light of the inadmissible and discredited financial information later provided to him by his client, Presidential Bank.  Tr. at 56.  As also noted, Mr. Buckles testified that he was aware of only one sale of a bungalow colony for as high as $3.5 million, which occurred about 15 years ago, well before the financial crisis, and was of a property with materially more units that Menorah's.  Tr. at 197-98.  It is thus highly unlikely that a comparable sales analysis would have corroborated Mr. Holenstein's revised income capitalization analysis in the way that his cost approach did.

[76] Buckles Rpt. at 149.

[77] Tr. at 192 (testimony of Mr. Buckles).

[78] Buckles Rpt. at 149.

[79] Tr. at 31.

and unreliable for estimating market value where a subject property is not brand new or close to brand new construction, (2) the Cost Approach gives only indirect consideration of the income-producing capability of a property such that real estate investors today tend to rely less on this method, and (3) [where] there is significant external obsolescence existing in the current market, which cannot be properly quantified by valuable market data").[80]  In light of the foregoing, Mr. Holenstein's cost method valuation should be disregarded.

The sales comparison valuation method, used by Messrs. Buckles and Amiel, "estimates the market value of a property by comparing it to similar properties that have been sold in the market recently.  In arriving at a subject property's value, sales data for similar properties is researched and analyzed, the amounts paid for these transactions are converted to a unit indicator of value . . . and the unit indicator is adjusted for any element of difference between the property sold and the property being appraised."  In re YL West 87th Hldgs. I LLC, 423 B.R. at 429 n.16.  Because of the unique nature of real property, the art in the sales comparison approach is to select comparable properties and make appropriate adjustments from them to the property at issue.  In re Ricci-Breen, 2015 Bankr. LEXIS 2909, at *16.  These adjustments are customarily shown on a grid that lists common characteristics of each of the comparable sales and the subject property and identifies the various adjustments of the comparable sales' characteristics to the subject's.

---

[80] Mr. Buckles' testimony suggests that bungalow colonies such as Menorah are being replaced on a different basis and that if such colonies remain as Menorah is today, they will become obsolete.  Tr. at 204-208; see also Tr. at 219-23, describing the only recently developed colony identified, which was built on a new model, with "villas."

There is an insurmountable problem, therefore, with Mr. Buckles' sales comparison analysis, because his sales comparison grid is illegible -- literally, it cannot be read.[81]  Thus the Court is effectively in the dark how to evaluate the key assumptions, comparisons and adjustments leading to Mr. Buckles' comparable sales method's conclusions.

This problem is made even more telling by indications that Mr. Buckles may have improperly adjusted his comparable sales upward without taking into account the downward effects on market pricing of the 23 older bungalows and Menorah's being an older colony.  At trial, Mr. Buckles acknowledged these effects, but he does not appear to have adjusted downward for them.[82]

Moreover, Mr. Buckles used two comparable *listings*, instead of sales, both of which were at the high end of the prices of his comparables.[83]  While listings might be used in a comparable sales analysis, the weighting and adjustment of them must be carefully considered. Obviously, a listing carries less weight than a sale and should be discounted more because it is merely an asking price,[84] but the degree of weighting and the appropriate discount depends on such factors as the time that the property has been on the market, how the asking price relates to comparable sales prices, and the similarity of the listed property to the comparable sales properties.  Here, not only are the asking prices for the two listings in Mr. Buckles' appraisal at the high end of his comparable sales range but also the listed properties appear to have been on the market for years, suggesting that those prices were unreasonable.[85]   Mr. Buckles

---

[81] Buckles Rpt. at 142; Tr. at 170-71 (no clean copy), 180-81 (acknowledging that adjustments would appear on grid).
[82] Tr. at 191-96, 223.
[83] Tr. at 179.
[84] Id.
[85] Tr. at 172-73, 174-75.

acknowledged that listings should not be weighted as much as actual sales,[86] but the illegible

nature of his grid makes it impossible to know how he weighted and discounted them.

On the other hand, Mr. Amiel's sales comparison analysis[87] not only was legible but

stood up on cross examination, and the Court accepts its $1,850,000 conclusion.

Given the difficulty of coming to a firm number on Menorah's net income, Mr. Amiel's

sales comparison analysis should carry somewhat more weight that the Court's own

deterimimation of the value of the Real Property based on the income capitalization approach.

Doing so results in a value for the Real Property of $1,840,000 as of the Plan' confirmation date.

**C.   There should be no charges to the Creditors' Collateral under 11 U.S.C. § 506(c).**   One fact,

at least, prevents the Debtor from being able to charge the Creditors' collateral pursuant to 11

U.S.C. § 506(c) with the cost of repairing the drainage problem and of satisfying the Village of

Woodbridge that the dilapidated older bungalows are properly dealt with:  the Debtor has not

yet spent the money for those purposes.  As stated in In re Flagstaff Foodservice Corp., 739 F.2d

73, 76 (2d Cir. 1984), to be eligible for treatment under 11 U.S.C. § 506(c) as a charge against

collateral, expenses must actually have been *incurred* by the debtor's estate for the benefit of

the secured creditor; see also Southwest Sec. FSB v. Segner (In re Domistyle, Inc.), 811 F.3d 691,

697 n.7 (11th Cir. 2015) (11 U.S.C. § 506(c) addresses recovery of costs and expenses incurred

by the debtor's estate).  There is no evidence that Menorah ever spent any of the cost of

repairing the drainage problem or demolishing the 23 older bungalows, although such costs are

predictable enough to have been factored into the income capitalization analysis above.  Of

---

[86] Tr. at 182.
[87] Buckles Rpt. at 57-71.

course, if such costs are actually incurred during the rest of this case, the Debtor may again seek a ruling under 11 U.S.C. §506(c) with respect to them.[88]

### **Conclusion**

For the foregoing reasons, the Court holds that the Creditors' aggregate secured claim in this case as of the Plan's confirmation date is $42,587.31 ($1,829,977.50 minus $1,785,325.69 minus $12,087).

Counsel for Menorah shall submit a proposed order consistent with this memorandum of decision allowing the Creditors' aggregate secured claims in the foregoing amount and classifying the remaining portion of their claims as unsecured, for treatment under ¶¶ 3.2 and 3.3 of the Plan, respectively.

Dated:  White Plains, New York
       August 5, 2016

                                    /s/ Robert D. Drain
                                    United States Bankruptcy Judge

---

[88] There is, however, a point beyond which an expense cannot be said to benefit a creditor's lien for purposes of 11 U.S.C. § 506(c):  where, given the amount of the expense in relation to the value of the creditor's interest in the collateral, a reasonable creditor would not incur it.